## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

JOHN DOE,

                Plaintiff,

    v.

TRANSUNION RENTAL
SCREENING SOLUTIONS, INC.,

            Defendant.

Civil Action No.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, proceeding in this action pseudonymously as John Doe ("Plaintiff" or "Mr. Doe") by and through his counsel brings the following Complaint against TransUnion Rental Screening Solutions, Inc. ("Defendant" or "TURSS") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of a tenant screening report that Defendant published to Plaintiff's potential landlord, in which Defendant inaccurately published information pertaining to Plaintiff's **set aside** criminal record.

## INTRODUCTION

1.    This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

1

2.     Defendant is a consumer reporting agency ("CRA") that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports, also known as tenant screening reports, generated from its database and furnishes these tenant screening reports to mortgage brokers, landlords, and property management companies who use the reports to make decisions regarding prospective borrowers and tenants.

3.     Defendant assembled and published an inaccurate tenant screening report to Plaintiff's prospective landlord, which included a criminal record that was **set aside** and should not have been reported at all.

4.     In Michigan, a court order that grants an application to set aside a criminal record has the same effect as the expungement of that criminal record.

5.     In fact, Plaintiff took the necessary steps to get the criminal record set aside and to ensure it would not be reported moving forward.

6.     Plaintiff's prospective landlord denied Plaintiff's housing application after receiving the tenant screening report from Defendant, in which Defendant published the **set aside** criminal record.

7.     Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available underlying public court records from Macomb County, Michigan regarding the **set aside** criminal record prior to publishing the information to Plaintiff's prospective landlord.

8.     Had Defendant performed even a cursory review of the underlying public court records, it would have discovered that the criminal record was **set aside** and should not have been reported in the tenant screening report prepared by Defendant.

9.     Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

10.     Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking housing by prejudicing their prospective landlords with inaccurate information.

11.     Defendant's inaccurate report cost Plaintiff the ability to rent the apartment unit that was suitably accommodating of his needs, causing him physical injury as a result of emotional distress, embarrassment, inconvenience, anxiety, fear of homelessness, and financial loss.

12.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time and money trying to correct the tenant screening report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss

of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

13.     As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

## PARTIES

14.     John Doe ("Plaintiff" or "Mr. Doe") is a natural person residing in Macomb, Michigan, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Trans Union Rental Screening Solutions, Inc. ("Defendant" or "TURSS") is a Florida corporation doing business throughout the United States, including the State of Michigan and in this District, and has a principal place of business located at 555 West Adams, Chicago, Illinois 60661.

16.     Among other things, Defendant sells consumer reports, often called tenant screening reports, to mortgage brokers, property management companies, and landlords for their use in deciding whether to rent or otherwise offer housing to a prospective tenant. These reports are provided in connection with a business transaction initiated by the consumer.

17.     Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating

4

and/or assembling information on consumers for the purpose of furnishing consumer reports for tenant screening purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

20.    Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

21.    While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the

consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

22. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

23. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR HOUSING APPLICANTS

24. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates tenant screening reports like the one Defendant prepared in Plaintiff's name.

25. The FCRA provides a number of protections for housing applicants who are the subject of tenant screening reports for the purpose of securing housing and credit.

26. In the parlance of the FCRA, tenant screening reports are "consumer reports," and providers of tenant screening reports, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

27. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise

their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

28.    Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

29.    Defendant disregarded its duties under the FCRA with respect to Plaintiff's tenant screening report.

## **DEFENDANT'S ILLEGAL BUSINESS PRACTICES**

30.    Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the tenant screening industry.

31.    Tenant Screening Reports are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating tenant screening reports.

32.    Tenant Screening companies, like Defendant, collect millions of records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court

7

records on an individual basis but instead is purchased in bulk or scraped from court websites.

33. Given that Defendant is in the business of selling tenant screening reports, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

34. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

35. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

36. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

37. Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting set aside criminal record.

38. As a provider of tenant screening reports, Defendant should be aware of the FCRA requirements and is likely a member of the Professional Background

Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

**A.      Plaintiff Applies for a House with Evernest-UW**

39.      In or about June 2023, Plaintiff began searching for a new house to live with his husband and two dogs. Specifically, Plaintiff was searching for a house that was in a safe neighborhood, clean, and within his budget.

40.      On or about July 17, 2023, Plaintiff toured a house located at 2626 Bonner Street Ferndale, Michigan ("Bonner Street House"). In accordance with Plaintiff's desires, the home was in a perfect location, had plenty of space for Plaintiff, his husband, and their two dogs, and was matching all their preferences.

41.      On or about July 17, 2023, Plaintiff applied online and paid an application fee in the amount of $65 dollars for the Bonner Street House.

**B.      Defendant Published an Inaccurate Tenant Screening Report to Evernest-UW**

42.      Evernest UW, property management company to the Bonner Street House, contracted with Defendant to conduct tenant screening reports on prospective tenants to determine whether the prospective tenant is eligible to rent this house.

43.      On or about July 2023, Evernest-UW ordered a tenant screening report on Plaintiff from Defendant.

44.     On July 21, 2023, Defendant sold a tenant screening report about Plaintiff to Evernest-UW, wherein Defendant published information including a compilation of Plaintiff's credit history, criminal history, and civil records history.

45.     The tenant screening report is a consumer report regulated by the FCRA.

46.     Within that tenant screening report, Defendant published inaccurate information about Plaintiff.

47.     Specifically, Defendant's tenant screening report about Plaintiff included a grossly inaccurate and stigmatizing **set aside** criminal conviction from Macomb County, Michigan.

48.     The criminal record reported by Defendant about Plaintiff was inaccurate.

49.     Curiously, Defendant's tenant screening report reported the same set aside criminal record twice, rendering its reporting double-inaccurate.

50.     Plaintiff was charged with the criminal record several years prior to the Defendant's publishing of the tenant screening report. After submitting an application and completing all necessary steps pursuant to Michigan state law, Plaintiff successfully had the record set aside on or about September 20, 2020.

51.     A cursory review of the widely available underlying public court records confirms that the set aside record is **not** available in the public record.

10

52.     The sole reason the inaccurate set aside criminal record was reported as belonging to Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the tenant screening report it sold about Plaintiff to Plaintiff's prospective landlord.

53.     Aside from the set aside criminal record, Plaintiff does not have a criminal record.

54.     Upon information and belief, aside from the set aside criminal record, Defendant's tenant screening report about Plaintiff did not contain any criminal records.

55.     Had Defendant followed reasonable procedures, it would have discovered that the criminal record had been set aside and that it should not have reported the same.

56.     In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective landlord inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**C.      Evernest-UW Denies Plaintiff's Housing Application**

57.     On or about July 21, 2023, Plaintiff received an email from Findigs, a company that manages tenant screening, vetting, and processing of rental applicants, and which was managing the tenant screening process for Evernest-UW, stating that

his housing application was denied as a direct result of the criminal record that had been reported by Defendant.

58.    Shortly thereafter, Plaintiff obtained a copy of the tenant screening report and was shocked and humiliated upon reviewing the expunged criminal record contained within the tenant screening report.

59.    On the same day, on July 21, 2023, Plaintiff contacted Findigs and informed them that he did not have any reportable criminal records and that the background report was obviously inaccurate to include any such criminal record.

60.    On or about the same day, Plaintiff contacted Evernest-UW and informed them, as well, that he was still interested in the property rental, and that he did not have any reportable criminal records and that the background report was obviously inaccurate to include any such criminal record.

61.    Plaintiff was very panicked, confused, and concerned about the impact of the inaccurate reporting of the set aside criminal record, both in relation to the Bonner Street House, but also the impact of the same on his future.

62.    Specifically, the underlying public court record information should not have been available to Defendant prior to publishing Plaintiff's tenant screening report to Evernest-UW, but Defendant failed to obtain accurate information and/or obtained out-of-date information from unreliable third party venders, such that the

court order that had set aside the criminal record was without force or effect upon Defendant's consumer reporting.

63.     Plaintiff tried to explain and reason with Evernest-UW, to no avail.

64.     Indeed, on or about July 21, 2023, Plaintiff paid $10 dollars to the Michigan State Police Criminal Justice Information Center via a tool known as "ICHAT" (Internet Criminal history Access Tool) and thereby obtained search results of a search of the Michigan State Police database of all criminal records maintained by the State of Michigan.

65.     Plaintiff was relieved, but also extremely concerned, to discover and confirm that the ICHAT results failed to recover any criminal records associated with Plaintiff's name and date of birth.

66.     Plaintiff submitted a copy of his ICHAT results to Evernest-UW. However, Evernest-UW responded on July 24, 2023 to state that "we cannot accept any documentation from the applicant or any third party to bypass the denial. . . . **We can only proceed with your application if TransUnion provides an updated or changed report."** (emphasis is original).

## D.   Plaintiff Disputed the Misinformation in Defendant's Tenant Screening Report

67.     On or about July 21, 2023, desperate to secure housing with Evernest-UW and riddled with worry over the far-reaching impacts of the inaccurate

information, Plaintiff disputed the inaccurate information with Defendant. Plaintiff disputed via telephone with Defendant.

68.     Plaintiff identified himself and provided information to Defendant to support his dispute.

69.     Plaintiff specifically disputed the inaccurate reporting of the criminal record, explained that the record had been set aside and that therefore the record should not have been reported at all.

70.     Plaintiff specifically asked Defendant to investigate and correct its reporting in any tenant screening report about Plaintiff.

71.     Defendant asked for documentation, and Plaintiff responded by supplying a copy of his ICHAT search results.

72.     On July 29, 2023, Plaintiff received Defendant's correspondence confirming that it had reinvestigated Plaintiff's dispute, conceded its erroneous reporting, and corrected the report.

73.     Defendant also represented to Plaintiff that it had issued a corrected tenant screening report to Evernest-UW.

74.     Plaintiff continued to follow up with Evernest-UW in hopes that his application for housing would be approved.

75.     Plaintiff reasonably believes that due to Defendant's inaccurate reporting in the first instance, Evernest-UW formed a negative opinion about Plaintiff and/or moved on to other candidates.

76.     Defendant's false report cost Plaintiff a housing opportunity that met his needs, including those attendant to affordability, safety, and proximity to work, friends, and family.

77.     Plaintiff was looking forward to living in Bonner Street House, because it was in a safe neighborhood, had a space for his two dogs, and was suitable for his needs.

78.     Accordingly, Plaintiff contacted Evernest-UW, after the reporting was corrected, to try to obtain and confirm final approval of his rental of the applied-for apartment.

79.     Evernest-UW requested Plaintiff to present proof of income. So, Plaintiff hired an attorney to draft an affidavit of employment for $500. Plaintiff sent the affidavit of employment to Evernest-UW.

80.     However, Plaintiff received a response that instead of an affidavit of income a W-2 form is needed. Plaintiff conferred with his employer and, considering how important this apartment was for Plaintiff, his employer agreed to accommodate and to render Plaintiff a W-2 employee.

81.     However, after Plaintiff's husband inquired if the W-2 form would be sufficient, the Evernest-UW representative said that they would additionally need three prior months of W-2 forms, as well, that Plaintiff did not have.

82.     Upon information and belief, Evernest-UW knew, at the time, that Plaintiff's employer had agreed to render Plaintiff a W-2 employee for purposes of securing the apartment, such that Plaintiff could not possibly have already three (3) months' worth of W-2 statements.

83.     Evernest-UW's conduct appears to have been intentionally designed to cause Plaintiff to be unable to qualify for the Evernest-UW apartment.

84.     Indeed, although Findigs had earlier been handling the tenant vetting and screening process, Evernest-UW inserted itself and made clear that it was taking over the processes in place of Findigs.

85.     Upon information and belief, Evernest-UW decided to insert itself into the tenant screening process in order to ensure that Plaintiff and his husband be found ineligible to secure the Evernest-UW rental.

86.     Accordingly, Evernest-UW denied, and continued to deny, the apartment rental to Plaintiff and his husband.

87.     Upon information and belief, Evernest-UW would have accepted Plaintiff's proof of income and would have allowed Plaintiff and his husband to rent

the apartment, had Defendant never reported the set aside criminal record on a background report concerning Plaintiff.

88.     At the time that Plaintiff had applied for the Evernest-UW apartment, Plaintiff was desperate to secure housing because his at-the-time residence suffered from severe plumbing and mold issues, for which invasive construction and repairs were ongoing.

89.     Although Plaintiff's at-the-time landlord had attempted to make certain accommodations, it was obvious that the plumbing and mold issues, including as relating to sewage, had deeply damaged the apartment, and rendered it unsafe and unsanitary.

90.     Accordingly, Plaintiff and his husband were forced to move quickly, and the Evernest-UW apartment denial was particularly harmful coming at a time during which Plaintiff and his husband were left stranded and had nowhere else to go.

91.     Due to Defendant's unreasonable procedures in the first instance and despite Plaintiff's continued efforts to seek housing, Plaintiff was forced to reside in his friend's basement, with his husband and their two dogs.

92.     Needless to say, Plaintiff, as a grown adult who is 35 years old, was deeply and utterly humiliated at having to move into his friend's basement.

93.     Further, his basement living quarters was small and hardly suitable for Plaintiff, his husband, and their two dogs.

94.     Additionally, the friend's basement's close living quarters, as well as their difficult circumstances, placed a heavy strain on Plaintiff's relationship with his husband.

95.     Eventually, Plaintiff was able to find another apartment rental, at an approximate cost of $2,400 per month, which was substantially more than the cost of the Evernest-UW apartment rental, which was being offered at approximately $2,000 per month.

96.     The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

97.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time and money trying to correct the tenant screening report; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

**CLAIMS FOR RELIEF**

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

98.   Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

99.   Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

100.   At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

101.   At all times pertinent hereto, the above-mentioned tenant screening report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

102.   Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the tenant screening report it sold about Plaintiff as well as the information it published within the same.

103.   As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time and money trying to correct the tenant screening report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss

19

of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

104.   Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

105.   Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

a)   Determining that Defendant negligently and/or willfully violated the FCRA;

b)   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

d)   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## <ins>DEMAND FOR JURY TRIAL</ins>

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: August 31, 2023   **CONSUMER ATTORNEYS**

        */s/ Levi Y. Eidelman*
        Levi Y. Eidelman, NY Bar No. 5742499
        300 Cadman Plaza West
        12th Floor, Suite 12049
        Brooklyn, NY 11201
        T: (718) 360-0763
        E: leidelman@consumerattorneys.com

        *Attorneys for Plaintiff John Doe*